73 A.3d 254

**Norman Bruce DERR**

v.

**STATE of Maryland.**

**No. 6, Sept. Term, 2010.**

Court of Appeals of Maryland.

Aug. 22, 2013.

Stephen B. Mercer, Chief Attorney, Forensics Division (Paul B. DeWolfe, Public Defender, Baltimore, MD; William G. McLain III of David A. Clark School of Law, University of the District of Columbia, Washington, DC), on brief, for appellant.

Robert Taylor, Jr., Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for appellee.

Argued before HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD, BELL *, JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

---

* Bell, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

GREENE, J.

On June 29, 2006, Appellant, Norman Bruce Derr ("Derr"), was convicted of multiple sexual offenses in the Circuit Court for Charles County. On appeal to the Court of Special Appeals, Derr challenged his conviction and presented five questions for review. Prior to the intermediate appellate court's rendering a decision in the case, this Court granted *certiorari* on its own motion, 411 Md. 740, 985 A.2d 538 (2009), to address the questions raised by Derr: [1, 2]

1. Whether [Norman] Derr's federal and state constitutional rights of confrontation were violated when the State was permitted to introduce the opinion of a serology examiner and the results of DNA [deoxyribonucleic acid] testing of biological evidence through the testimony of an expert who did not participate either directly or in a supervisory capacity in the testings, without calling the analysts who performed the testings as witnesses or showing that the analysts were unavailable and that [Norman] Derr had a prior opportunity to cross-examine them?

**1.** On September 29, 2011, we concluded that Derr's Sixth Amendment right to confrontation was violated, reversed the Circuit Court's judgment, and ordered a new trial. *Derr v. State,* 422 Md. 211, 29 A.3d 533 (2011). On December 6, 2011, the State filed a petition for certiorari in the United States Supreme Court and requested that the petition be held pending that Court's decision in *Williams v. Illinois,* 567 U.S. ——, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). On June 18, 2012, the Supreme Court decided *Williams,* altering the analysis of an alleged Confrontation Clause violation. On June 29, 2012, the Supreme Court granted certiorari in *Derr,* vacated our earlier judgment, and remanded the present case to this Court "for further consideration in light of *Williams v. Illinois* [ ]." *Maryland v. Derr,* —— U.S. ——, ——, 133 S.Ct. 63, 64, 183 L.Ed.2d 700, 700 (2012). On August 20, 2012, we ordered "supplemental briefing and oral argument [to] be completed separately" on the application of "the Confrontation Clause of the Sixth Amendment" and the application of "the Confrontation Clause of Article 21...." " Supplemental oral argument occurred on January 4, 2013.

**2.** Appellant, Norman Derr, separated the first question into two separate questions regarding the DNA and serological testing. We combined the Confrontation Clause challenges into one question because we shall apply the same analysis to all forensic evidence.

2. Whether [Norman] Derr's constitutional and statutory rights to discovery necessary to prepare a defense to scientific evidence were violated when the State used a statistical method to describe the rarity of a DNA profile that did not quantify the chance of a coincidental match caused by the trawl of a DNA database and [Norman] Derr was denied access to the number of coincidental matches contained in the database, where the coincidental match number was required to demonstrate the limitation of the State's chosen statistic?

3. Whether a "match" derived from a trawl of a DNA database, the significance of which was described by the State with a statistic that did not account for laboratory error or the chance of a coincidental match caused by the trawl of a DNA database, was sufficient evidence to sustain [Norman] Derr's convictions in the absence of any other evidence that corroborated his identification as the perpetrator of the offenses?

4. Whether the court erred when it refused to instruct the jury on the meaning of the term "reasonable degree of scientific certainty" when the State's expert used that term before the jury to characterize her opinion that [Norman] Derr was the source of DNA evidence?

Following remand, supplemental briefing, and oral argument in this Court, we affirm the judgment of the Circuit Court and conclude: (1) Derr's right of confrontation was not violated when the State's expert witness presented the results of forensic tests [3] as the basis for her conclusion that Derr was the source of the deoxyribonucleic acid ("DNA") found on the vaginal swabs taken from the rape victim; (2) Derr's statutory and constitutional rights to discovery were not violated by the trial judge's refusal to order the State to conduct a search for coincidental matches in the Federal Bureau of Investigation's

---

**3.** We note that although the State's expert witness presented the notes from the examiner who conducted the serological examination in 1985, these notes pertained to the results of the serological test and so, in this opinion, we collectively refer to the evidence presented from both the serological and DNA testings as forensic test results.

Combined DNA Index System ("CODIS"); (3) the evidence presented during trial was legally sufficient to sustain Derr's conviction; and (4) the trial judge did not err when she refused to include Derr's proposed jury instruction on the definition of "reasonable degree of scientific certainty."

## FACTUAL BACKGROUND

Derr was indicted with multiple sexual offenses relating to an attack and rape of a woman in Charles County, Maryland in December 1984. After the sexual assault, the victim was transported to the hospital where she was examined by medical personnel. In the process of collecting biological evidence, medical personnel used a "rape kit"[4] to collect, among other things, a blood sample, a genital swab, two vaginal swabs, and an anal swab from the victim. Additionally, the victim was interviewed by officers from the Charles County Sheriff's Office ("Sheriff's Office") and the victim assisted them in creating a composite sketch of the attacker from her memory.

The physical evidence collected, including the rape kit, was sent to the Federal Bureau of Investigation ("FBI") laboratory for serological testing. In 1985, a serological examiner identified sperm and semen on parts of the swabs and detailed the findings in serological examination notes. Despite the testing and investigation, the case remained unsolved and became inactive.

In 2002, the Sheriff's Office submitted the rape kit to the FBI laboratory for additional forensic analysis. The laboratory generated a DNA profile of the suspect, consisting of thirteen genetic markers (thirteen "loci"), from the DNA in the biological material on the vaginal swabs. This profile was entered into the FBI's national database in CODIS.[5] In 2004,

---

4. A rape kit is a kit used by hospitals to collect biological evidence. *See Horton v. State*, 412 Md. 1, 9, 985 A.2d 540, 544 (2009).

5. "Authorized by Congress and supervised by the Federal Bureau of Investigation, the Combined DNA Index System (CODIS) connects DNA laboratories at the local, state, and national level. Since its authoriza-

a match was discovered between Derr's existing profile in CODIS and the profile generated in 2002 from the rape kit. The Sheriff's Office obtained a search warrant to seize additional DNA from Derr through a buccal swab,[6] which was sent to the FBI laboratory in order to create a new "reference DNA sample" and to verify that Derr's profile in CODIS was accurate. In September 2004, the Charles County Grand Jury returned an indictment charging Derr with five counts of sex-related crimes. In 2006, the State, pursuant to a warrant, collected buccal swabs from Derr's two brothers, from which the FBI laboratory derived DNA profiles.

In June 2006, Derr was tried before a jury in the Circuit Court for Charles County. On June 29, 2006, the jury found Derr guilty of first and second degree rape and first and second degree sexual offense, but not guilty on two counts of third degree sexual offense. Derr filed a timely appeal to the Court of Special Appeals. This Court granted *certiorari* on its own motion prior to any decision by the Court of Special Appeals. *See Derr v. State*, 411 Md. 740, 985 A.2d 538 (2009).

We now turn to the trial court proceedings. At trial, the State called a number of witnesses, including: the victim; the nurse who performed much of the victim's examination; Derr's two brothers; and a number of law enforcement officers who participated in investigating the rape and collecting and handling the forensic samples taken from the victim, Derr,

---

tion in 1994, the CODIS system has grown to include all 50 States and a number of federal agencies. CODIS collects DNA profiles provided by local laboratories taken from arrestees, convicted offenders, and forensic evidence found at crime scenes. To participate in CODIS, a local laboratory must sign a memorandum of understanding agreeing to adhere to quality standards and submit to audits to evaluate compliance with the federal standards for scientifically rigorous DNA testing." *Maryland v. King*, 569 U.S. ——, ——, 133 S.Ct. 1958, 1968, 186 L.Ed.2d 1 (2013).

6. "A 'buccal' sample is obtained by swabbing the check area inside of a person's mouth." *Young v. United States*, 63 A.3d 1033, 1036 n. 3 (D.C.2013) (citing *United States v. Mitchell*, 652 F.3d 387, 406–07 (3d Cir.2011)); *see also State v. Raines*, 383 Md. 1, 5–6, 857 A.2d 19, 22 (2004) (plurality) (describing the taking of a buccal swab as having the inside of one's cheek swabbed).

and Derr's brothers. Additionally, through its witnesses, the State offered, and the court received into evidence, among other things, a composite sketch of the victim's attacker and the rape kit. Further, after the parties stipulated that they were fair and accurate depictions of Derr in 1982 and 1986, the court accepted into evidence photographs of Derr.

Additionally, the State called Jennifer Luttman ("Luttman"), a forensic DNA examiner for the FBI, who was accepted as an "expert in forensic serology and forensic DNA analysis." In her testimony, Luttman provided background information about DNA, how it is analyzed and how DNA profiles are created, and how those profiles are used by the FBI to find the source of a DNA sample. Additionally, Luttman testified that DNA testing is performed by teams consisting of examiners, serologists, and DNA biologists.

After providing background information, Luttman testified about the present case. Luttman testified that her role was to do comparisons between known and unknown DNA samples, do the statistical calculations and write a report; that her "team" participated in the actual analysis of some of the DNA, but not all of the DNA, in the case; and that she reached her conclusions after reviewing the "bench work"[7] of both the DNA analysis conducted by her team and that which was performed by analysts that she did not supervise.

Over Derr's objection, Luttman identified and explained the DNA profiles from the 2006 DNA tests of the biological material taken from Derr's brothers, noting both that the DNA profiles were developed from the testing by Luttman's "team" and that she only needed to identify information from nine, rather than thirteen, loci because it provided enough information to exclude Derr's brothers as possible sources of

---

7. With regard to the meaning Luttman attached to the term "bench work," she stated: "The biologists are the people who go into the laboratory and actually do what we call the wet chemistry. They're the ones who look at the items of evidence and then examine those items for blood and semen and then do the DNA testing. They give me then all of their results and I'm the one who does all of the interpretation."

the DNA found on the vaginal swabs. Luttman testified about the DNA profile produced in 2004 from the DNA sample taken from Derr and, over objection, the profile was introduced into evidence. In addition, also over Derr's objection, Luttman introduced the results of the 2002 DNA testing on the pieces of biological evidence in the rape kit. And, over objection, the profiles developed from the 2002 DNA test were entered into evidence.

Luttman, additionally, testified about how the FBI determines the rarity of a DNA profile using the "product rule." Luttman explained that this approach entails "basically ... multiplying the frequencies across all [thirteen loci] to get the probability of selecting someone at random from the general population that would have the same DNA that's found on the evidence."

Finally, Luttman presented her conclusions. First, she stated that the DNA taken from the vaginal swabs, analyzed in 2002, matched the DNA taken from Derr's buccal swab, analyzed in 2004 "at all 13 DNA locations." She further testified that, although the tests on the biological material from the anal and genital swabs did not produce readings at all thirteen loci, the readings the tests did produce matched the DNA profile from Derr's sample. Then, over objection, Luttman testified that "[t]he probability of selecting an unrelated individual from the general population that would have the same DNA profile that was found on the [vaginal swabs]" was more than one in a quadrillion. Luttman further stated that although the likelihood of a sibling having the same DNA profile is more likely, the results from the 2006 test on the samples taken from Derr's two brothers indicated that their DNA was excluded. Next, Luttman, over objection, concluded, based upon the "serology report" and "serology notes" from the 1985 serological test, that the biological material on the vaginal swabs, the anal swab, and the genital swab was semen. Additionally, over Derr's objection, the examination notes from the 1985 serological examination were accepted into evidence. Thereafter, Luttman gave her final conclusion, "that specimen K10 [the DNA specimen from Derr's sample],

which is Norman Derr, is the source of the DNA found on specimens Q 15 and Q 16 [the vaginal swabs] to a reasonable degree of scientific certainty."

Luttman did not conduct or supervise the 1985 serological testing or the 2002 DNA testing of the rape kit. Further, Luttman did not perform the actual DNA testing in 2004 or 2006, and while she "supervised" or reviewed her team's analysis, there is no indication that she observed the bench work at the time it was performed by her team. The results of these tests, however, were presented as the basis for Luttman's in-court testimony that Derr was the source of the DNA found on the victim.

The defense filed a number of preliminary motions in the Circuit Court and pretrial hearings were held to consider these motions. Additionally, during trial, two conferences between the trial judge and the attorneys were held, largely outside the presence of the jury, to determine whether the State could introduce through Luttman's testimony the 1985 notes of the serological examiner and the results of the DNA analysis from 2002 and 2004. The Circuit Court permitted Luttman to testify about the results and admitted them into evidence under the business records exception to the hearsay rule [8] and Maryland Rule 5–703 [9] as the basis for Luttman's

---

**8.** Maryland Rule 5–803 defines hearsay exceptions as those statements which are "not excluded by the hearsay rule, even though the declarant is available as a witness[.]" Md. Rule 5–803(b)(6) encompasses the "business records exception," which delineates those statements that are considered "[r]ecords of regularly conducted business activity" and are, therefore, admissible as an exception to the hearsay rule:

A memorandum, report, record, or data compilation of acts, events, conditions, opinions, or diagnoses if (A) it was made at or near the time of the act, event, or condition, or the rendition of the diagnosis, (B) it was made by a person with knowledge or from information transmitted by a person with knowledge, (C) it was made and kept in the course of a regularly conducted business activity, and (D) the regular practice of that business was to make and keep the memorandum, report, record, or data compilation.

**9.** Md. Rule 5–703 explains the proper basis of opinion testimony by experts. The Rule states, in part:

expert opinion. At trial, the State did not call the serological examiner or the FBI DNA analysts who performed the DNA testings.

## DISCUSSION

### *I. The Confrontation Clause*

■ Both the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights provide a criminal defendant in a Maryland court with the right to confront witnesses who testify against the defendant.[10] *Cox v. State*, 421 Md. 630, 642, 28 A.3d 687, 694 (2011). In past cases, we have read the two rights *in pari materia*, or as generally providing the same protection to defendants. *See Grandison v. State*, 425 Md. 34, 64, 38 A.3d 352, 370 (2012); *Lawson v. State*, 389 Md. 570, 587 n. 7, 886 A.2d 876, 886 n. 7 (2005); *State v. Snowden*, 385 Md. 64, 74–75 n. 9, 867 A.2d 314, 320 n. 9 (2005). Derr has failed to persuade this Court to deviate from that practice, and so we shall consider both rights under the same analysis.[11]

---

(a) **In general.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

(b) **Disclosure to jury.** If determined to be trustworthy, necessary to illuminate testimony, and unprivileged, facts or data reasonably relied upon by an expert pursuant to section (a) may, in the discretion of the court, be disclosed to the jury even if those facts and data are not admissible in evidence. Upon request, the court shall instruct the jury to use those facts and data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference.

10. The Sixth Amendment provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him [or her.]" U.S. Const. amend. VI. Article 21 of the Maryland Declaration of Rights states that "in all criminal prosecutions, every man [and woman] hath a right ... to be confronted with the witnesses against him [or her] ... [and] to examine the witnesses for and against him on oath[.]" Md. Decl. of Rts. art. 21.

11. Although there is no majority opinion of the Supreme Court in *Williams*, as we indicate below, the narrowest grounds leading to the

Derr argues that in our 2011 opinion in the present case *("Derr I ")*, this Court applied "a straightforward application of the Supreme Court's decisions in *Crawford* [*v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ], *Melendez–Diaz* [*v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) ], and *Bullcoming* [*v. New Mexico*, 564 U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011) ]" to find a violation of Derr's "rights of confrontation and cross-examination." He further contends that *Williams v. Illinois*, 567 U.S. ——, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), "does not alter the rationale or result in *Derr I* [.]" Derr asserts that this is because, in *Williams*, the only "point" agreed upon by five Supreme Court Justices was that the DNA evidence was offered for the truth of the matter asserted, which is what this Court determined in *Derr I*. Derr, thus, argues that *Williams* is "limited to the particular circumstances of that case where the scientific 'basis' evidence, in a bench trial, was not admitted for its truth[,]" which is distinct from the facts in the present case, which involved a jury trial where the test results were admitted into evidence for their truth. Derr maintains that this Court should, therefore, reinstate *Derr I* "on the strength of *Crawford, Melendez–Diaz,* and *Bullcoming.*" Additionally, Derr contends:

> Although the divided decision in *Williams* does not overturn *Crawford, Melendez–Diaz,* or *Bullcoming,* or require reversal of the Court's decision here, it has nonetheless caused confusion in the lower courts about the application of the Sixth Amendment right of confrontation to scientific evidence generated for use in a criminal case. Where, as here, the divergent views of the Supreme Court expressed in *Williams* have an unsettling effect on the application of a federal constitutional right, principles of federalism support an independent assessment of the rights of confrontation and cross-examination under Article 21. The decision here

---

judgment of the Court can be discerned and applied in the present case. Therefore, we analyze the present case applying *Williams* and base our decision on the Sixth Amendment read *in pari materia* with Article 21 of the Maryland Declaration of Rights.

can—and should, therefore—plainly state that it is grounded on an independent assessment of the rights of confrontation and cross-examination protected under the Maryland Declaration of Rights.

Noting the difference between the language in the Sixth Amendment and Article 21, Derr asserts that we "should reinstate [our] prior decision and judgment in this case, and plainly state that the decision is based on the independent state ground of Article 21, as well as the Sixth Amendment."

The State argues, in response, that while *Williams* "was divided, the plurality's opinion adhered to principles the Supreme Court had established in its Confrontation Clause jurisprudence since its opinion in *Crawford v. Washington....* " The State contends that this Court should apply the plurality's decision and reach the same conclusion as the *Williams* Court, that there was no violation of the right of confrontation.

On review of the present case, ultimately, we determine that the in-court testimony from the State's expert witness, Jennifer Luttman, was subject to cross-examination by Derr's attorney and presents no Confrontation Clause issues. Applying the narrowest holding of the plurality opinion and Justice Thomas's concurring opinion in *Williams*, we further conclude that the information relied upon and presented as the basis for Luttman's in-court testimony is not testimonial. Specifically, she relied upon the 1985 serological examination notes, the test results and DNA profiles from the 2002 DNA test on the biological evidence in the rape kit, and the test results and DNA profiles from the 2004 DNA test of the buccal sample provided by Derr. Thus, Luttman's introduction of the test results as the basis for her in-court testimony does not offend Derr's right to confront witnesses.

## A. Applicable Law

The Fourteenth Amendment renders the Sixth Amendment right of confrontation binding on all states. *Cox*, 421 Md. at 642, 28 A.3d at 694.[12] Prior to 2004, when

---

12. Generally, the right to confront adverse witnesses can be waived. *See Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 314 n. 3, 129 S.Ct.

evaluating whether the right to confront witnesses was violated, courts applied the standard announced in *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980). *Roberts* expressed that the Confrontation Clause did not prevent courts from admitting the statement of an "unavailable" declarant when the statement "bears adequate 'indicia of reliability[,]' " which "can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." In *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court overruled *Roberts* and changed the framework for determining whether the right to confront adverse witnesses had been violated. *See Michigan v. Bryant,* 562 U.S. ——, ——, 131 S.Ct. 1143, 1152, 179 L.Ed.2d 93, 104 (2011). Since that time, this Court has applied the *Crawford* framework. *See Cox,* 421 Md. at 642, 28 A.3d at 694; *Langley v. State,* 421 Md. 560, 562, 28 A.3d 646, 647 (2011); *State v. Lucas,* 407 Md. 307, 311, 965 A.2d 75, 78 (2009); *Snowden,* 385 Md. at 68, 867 A.2d at 316.

 Under the framework established by *Crawford* and its progeny, the Confrontation Clause only applies when an out-of-court statement constitutes testimonial hearsay. In other words, there are two limitations on the reach of the right to confront witnesses. First, the right only applies if a statement is testimonial; nontestimonial statements are governed by the applicable rules of evidence. *See Cox,* 421 Md. at 643, 28 A.3d at 694; *Bryant,* 562 U.S. at ——, 131 S.Ct. at 1153, 179 L.Ed.2d at 104–05. Second, the Confrontation

---

2527, 2534 n. 3, 174 L.Ed.2d 314, 323 n. 3 (2009) (citation omitted) ("The right to confrontation may, of course, be waived, including by failure to object to the offending evidence; and States may adopt procedural rules governing the exercise of such objections."); *see also* Md. Rule 4–323(a) (Generally, "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived."). Additionally, the right can be forfeited through "wrongdoing." *See Davis v. Washington,* 547 U.S. 813, 833, 126 S.Ct. 2266, 2280, 165 L.Ed.2d 224, 244 (2006) ("[O]ne who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation.").

Clause only applies to hearsay, or out-of-court statements offered and received to establish the truth of the matter asserted. *See Crawford,* 541 U.S. at 59–60 n. 9, 124 S.Ct. at 1369 n. 9, 158 L.Ed.2d at 197–98 n. 9; *see also Williams,* 567 U.S. at ——, 132 S.Ct. at 2235, 183 L.Ed.2d. at 106 (plurality); *Williams,* 567 U.S. at ——, 132 S.Ct. at 2256, 183 L.Ed.2d at 129 (Thomas, J., concurring in judgment); *Williams,* 567 U.S. at ——, 132 S.Ct. at 2268, 183 L.Ed.2d at 142 (Kagan, J., dissenting).

Once the Confrontation Clause is implicated, however, *Crawford* established that the State can only introduce a statement against the defendant from an absent witness if two conditions are satisfied. The declarant must be unavailable and the defendant must have had a prior opportunity to cross-examine the declarant. *Crawford,* 541 U.S. at 53–54, 124 S.Ct. at 1365–66, 158 L.Ed.2d at 194; *see also Bullcoming,* 564 U.S. at ——, 131 S.Ct. at 2713, 180 L.Ed.2d at 619.

The critical inquiry in many cases will often be whether the challenged statement is testimonial. *See Young v. United States,* 63 A.3d 1033, 1039 (D.C.2013) ("The critical question in Confrontation Clause jurisprudence is the meaning of the term 'testimonial.' "). In two cases, *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) and *Bullcoming v. New Mexico,* 564 U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), the Court concluded that the forensic test results in those cases were testimonial and their introduction violated the Confrontation Clause.

In *Melendez–Diaz,* the defendant was charged with distributing and trafficking in cocaine. 557 U.S. at 308, 129 S.Ct. at 2530, 174 L.Ed.2d at 320. During the trial, the prosecution entered into evidence three "certificates of analysis" that were sworn to before a notary public and indicated that the substance found in bags that had been attributed to the defendant were examined and were found to contain cocaine. 557 U.S. at 308, 129 S.Ct. at 2530–31, 174 L.Ed.2d at 320. In concluding that the certificates were testimonial, and their introduction violated the Confrontation Clause, the Supreme Court

expressed that the certificates were "quite plainly affidavits," were "functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination," and were "not only ... made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," but state law provided that "the sole purpose of the affidavits was to provide prima facie evidence...." 557 U.S. at 310–11, 129 S.Ct. at 2532, 174 L.Ed.2d at 321–22 (emphasis omitted) (quotations omitted).

In *Bullcoming,* the defendant was arrested and charged with driving while intoxicated (DWI) and the "[p]rincipal evidence against [the defendant] was a forensic laboratory report certifying that [the defendant's] blood-alcohol concentration was well above the threshold for aggravated DWI." 564 U.S. at ——, 131 S.Ct. at 2709, 180 L.Ed.2d at 615–16. Rather than calling the analyst who signed the certification as a witness, the state called "another analyst who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on [the defendant's] blood sample." 564 U.S. at ——, 131 S.Ct. at 2709, 180 L.Ed.2d at 616. The Court concluded that the forensic laboratory reports at issue were testimonial because they were "document[s] created solely for an evidentiary purpose ... made in aid of a police investigation...." 564 U.S. at ——, 131 S.Ct. at 2717, 180 L.Ed.2d at 623 (citation and quotation omitted). The Court further concluded "that surrogate testimony [where the testifying expert witness does not certify the introduced forensic test results and did not perform or observe the performance of the tests that produced those results] does not meet the constitutional requirement." 564 U.S. at ——, 131 S.Ct. at 2710, 180 L.Ed.2d at 616.

*Williams v. Illinois,* 567 U.S. ——, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), is the Supreme Court's most recent case involving the admissibility of forensic evidence pursuant to the Confrontation Clause. In *Williams,* the defendant was convicted in a bench trial of, among other things, a sex-related crime. 567 U.S. at ——, ——, ——, 132 S.Ct. at 2227, 2229,

2231, 183 L.Ed.2d at 98, 100, 102 (plurality). After the victim of the crime was attacked, she was taken to the hospital "where doctors treated her wounds and took a blood sample and vaginal swabs for a sexual-assault kit." 567 U.S. at ——, 132 S.Ct. at 2229, 183 L.Ed.2d at 100 (plurality). The vaginal swabs were sent to Cellmark Diagnostics Laboratory ("Cellmark") and "Cellmark sent back a report containing a male DNA profile produced from semen taken from those swabs." *Id.* Dr. Lambatos, a forensic specialist with the Illinois State Police ("ISP") Laboratory, "conducted a computer search" that "showed a match to a profile produced by the lab from a sample of [the defendant's] blood that had been taken after he was arrested on unrelated charges...." *Id.* After the victim identified the defendant in a lineup, the defendant was indicted and then tried and convicted in a bench trial. 567 U.S. at ——, 132 S.Ct. at 2229, 2231, 183 L.Ed.2d at 100, 102 (plurality).

The Confrontation Clause issue in *Williams* pertained to the expert witness testimony of Dr. Lambatos, who did not participate in the development of the DNA profile from a vaginal swab containing biological material taken from the victim. 567 U.S. at ——, 132 S.Ct. at 2230, 183 L.Ed.2d at 101 (plurality). When asked by the prosecutor, "Did you compare the semen that had been identified ... from the vaginal swabs of [the victim] to the male DNA profile that had been identified ... from the blood of [the defendant][,]" Dr. Lambatos replied yes. *Id.* (quotation omitted). Dr. Lambatos "then testified that, based on her own comparison of the two DNA profiles, she concluded that [the defendant] cannot be excluded as a possible source of the semen identified in the vaginal swabs[.]" *Id.* (quotation omitted). Dr. Lambatos further testified about the remote probability of the profile appearing elsewhere in the general population and, finally, when asked by the prosecutor "whether she would call this a match to [the defendant], Dr. Lambatos answered yes, ... over defense counsel's objection." *Id.* (quotation omitted).

The defendant's "main argument" was that Dr. Lambatos "referred to the DNA profile provided by Cellmark as having

been produced from semen found on the victim's vaginal swabs[,]" even though she did not have firsthand knowledge that the DNA profile was in fact developed from that source. 567 U.S. at ——, 132 S.Ct. at 2227, 183 L.Ed.2d at 98 (plurality). As indicated above, a violation of the Confrontation Clause requires that a statement both be testimonial and be admitted for its truth. Both the Illinois intermediate appellate court and the Illinois Supreme Court concluded that this statement about the Cellmark report was not admitted for the truth of the matter asserted and, therefore, held that there was no Confrontation Clause violation. 567 U.S. at ——, 132 S.Ct. at 2227–28, 183 L.Ed.2d at 98 (plurality). Five Justices of the United States Supreme Court agreed to affirm the Illinois Supreme Court's judgment that there was no Confrontation Clause violation in the case. 567 U.S. at ——, 132 S.Ct. at 2244, 183 L.Ed.2d at 116 (plurality); 567 U.S. at ——, 132 S.Ct. at 2245, 183 L.Ed.2d at 117 (Breyer, J., concurring); 567 U.S. at ——, 132 S.Ct. at 2255, 183 L.Ed.2d at 129 (Thomas, J., concurring in judgment).

Four opinions were issued in *Williams,* none of which was supported by the majority of Justices. Justice Alito wrote the plurality opinion, joined by Chief Justice Roberts and Justices Kennedy and Breyer. Justices Thomas and Breyer [13] each wrote concurring opinions (Justice Thomas concurring in judgment only) which no other Justice joined. And finally, Justice Kagan wrote a dissenting opinion joined by Justices Scalia, Ginsburg, and Sotomayor. Justice Thomas and the four dissenting Justices all agreed that the Cellmark report, or more specifically "Cellmark's statements—that it successfully derived a male DNA profile and that the profile came from [the victim's] swabs . . .," 567 U.S. at ——, 132 S.Ct. at 2256, 183 L.Ed.2d at 129 (Thomas, J., concurring in judgment), was

---

**13.** While Justice Breyer wrote a concurring opinion, he stated "the plurality's opinion is basically consistent with the views set forth [in his concurring opinion, and so] I join that opinion in full." 567 U.S. at ——, 132 S.Ct. at 2252, 183 L.Ed.2d at 125 (Breyer, J., concurring). Therefore, we will not discuss Justice Breyer's concurring opinion in detail.

offered for its truth, while the plurality opinion concluded that the Cellmark report was presented not for its truth but only as the basis for the State's expert's opinion. *See* 567 U.S. at ——, 132 S.Ct. at 2228, 183 L.Ed.2d at 99 (plurality); 567 U.S. at ——, 132 S.Ct. at 2256, 183 L.Ed.2d at 129 (Thomas, J., concurring in judgment); 567 U.S. at ——, 132 S.Ct. at 2268, 183 L.Ed.2d at 143 (Kagan, J., dissenting). This did not control the final judgment, however, because both the plurality opinion and Justice Thomas's opinion concluded that the challenged Cellmark report was not testimonial, and, thus, this narrow majority of the Supreme Court concluded that the introduction of the Cellmark report did not violate the Confrontation Clause.

The plurality opinion determined that Dr. Lambatos's statements about Cellmark's DNA report were not introduced for the truth of the matter asserted and their introduction did not violate the Confrontation Clause. 567 U.S. at ——, 132 S.Ct. at 2228, 2240, 183 L.Ed.2d at 99, 112 (plurality). The plurality stated, however, that even if the report was entered for the truth of the matter asserted, they "would nevertheless conclude that there was no Confrontation Clause violation." 567 U.S. at ——, 132 S.Ct. at 2242, 183 L.Ed.2d at 114 (plurality). This was because the plurality determined: (1) the Supreme Court has "interpreted the Confrontation Clause as prohibiting modern-day practices that are tantamount to the abuses that gave rise to the recognition of the confrontation right[,]" *id.;* (2) "any further expansion would strain the constitutional text[,]" *id.;* and (3) "the use at trial of a DNA report prepared by a modern, accredited laboratory bears little if any resemblance to the historical practices that the Confrontation Clause aimed to eliminate[,]" 567 U.S. at ——, 132 S.Ct. at 2244, 183 L.Ed.2d at 116 (quotation omitted) (plurality).

In reaching this conclusion, the plurality opinion began by noting:

> The abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted

individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions. 567 U.S. at ——, 132 S.Ct. at 2242, 183 L.Ed.2d at 114 (plurality). The plurality then expressed that in all of "the post-*Crawford* cases in which a Confrontation Clause violation has been found," except *Hammon v. Indiana*,[14] "both of these characteristics were present." *Id.* (citations and footnote omitted). The plurality noted that in Hammon, the Supreme Court concluded that an informal statement made to police was testimonial. 567 U.S. at ——, 132 S.Ct. at 2243, 183 L.Ed.2d at 115 (plurality). In a footnote in the plurality opinion in Williams, however, the plurality expressed doubts as to the soundness of this conclusion. The plurality opinion stated that "[e]xperience might yet show that the holdings in those [post-Crawford] cases should be reconsidered for the reasons, among others, expressed in the dissents the decisions produced. Those decisions are not challenged in this case and are to be deemed binding precedents, but they can and should be distinguished on the facts here." 567 U.S. at ——, 132 S.Ct. at 2242 n. 13, 183 L.Ed.2d at 114 n. 13 (plurality). The plurality opinion ultimately concluded that the Cellmark report "plainly was not prepared for the primary purpose of accusing a targeted individual[,]" an essential element of the plurality's standard for whether it was testimonial. 567 U.S. at ——, 132 S.Ct. at 2243, 183 L.Ed.2d at 115 (plurality). The plurality opinion, therefore, concluded that the defendant's right to confront witnesses was not violated in *Williams*. 567 U.S. at ——, 132 S.Ct. at 2244, 183 L.Ed.2d at 116 (plurality).

Justice Thomas concurred with the plurality's final judgment, providing the crucial fifth vote for a majority of the Court to conclude that there was no Confrontation Clause violation. According to Justice Thomas's concurrence, this conclusion, however, is so "solely because Cellmark's statements lack the requisite 'formality and solemnity' to be consid-

---

14. *Hammon* was decided together with *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

ered 'testimonial' for the purposes of the Confrontation Clause." 567 U.S. at ——, 132 S.Ct. at 2255, 183 L.Ed.2d at 129 (Thomas, J., concurring in judgment).

In his concurrence, Justice Thomas rejected the plurality opinion's "primary purpose test," that the Cellmark report was not prepared "for the primary purpose of accusing a targeted individual[,]" as "lack[ing] any grounding in constitutional text, in history, or in logic." 567 U.S. at ——, 132 S.Ct. at 2262, 183 L.Ed.2d at 135 (Thomas, J., concurring in judgment). In his opinion, he stated that the proper primary purpose test was that "for a statement to be testimonial within the meaning of the Confrontation Clause, the declarant must primarily intend to establish some fact with the understanding that his statement may be used in a criminal prosecution." 567 U.S. at ——, 132 S.Ct. at 2261, 183 L.Ed.2d at 135 (Thomas, J., concurring in judgment) (citation omitted). Justice Thomas, however, concluded that while satisfying the primary purpose test is a "necessary criterion," it is not "sufficient" to render a statement testimonial. 567 U.S. at ——, 132 S.Ct. at 2261, 183 L.Ed.2d at 135 (Thomas, J., concurring in judgment). Justice Thomas explained that he "continue[s] to think that the Confrontation Clause regulates only the use of statements bearing indicia of solemnity." 567 U.S. at ——, 132 S.Ct. at 2259, 183 L.Ed.2d at 133 (Thomas, J., concurring in judgment) (quotation omitted). Those statements, Justice Thomas explained, include "formalized testimonial materials, such as depositions, affidavits, and prior testimony, or statements resulting from formalized dialogue, such as custodial interrogation." 567 U.S. at ——, 132 S.Ct. at 2260, 183 L.Ed.2d at 133 (Thomas, J., concurring in judgment) (citation and quotation omitted). Additionally, Justice Thomas noted that the Confrontation Clause is implicated by "the use of technically informal statements when used to evade the formalized process." 567 U.S. at ——, 132 S.Ct. at 2260 n. 5, 183 L.Ed.2d at 133 n. 5 (Thomas, J., concurring in judgment).

Applying this standard, Justice Thomas concluded that "Cellmark's report" is not testimonial because "[t]he Cellmark report lacks the solemnity of an affidavit or deposition, for it is

neither a sworn nor a certified declaration of fact. Nowhere does the report attest that its statements accurately reflect the DNA testing processes used or the results obtained." 567 U.S. at ——, 132 S.Ct. at 2260, 183 L.Ed.2d at 133 (Thomas, J., concurring in judgment) (citation omitted). Justice Thomas's concurrence further notes that the challenged "report is signed by two reviewers, but they neither purport to have performed the DNA testing nor certify the accuracy of those who did. And, although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation." 567 U.S. at ——, 132 S.Ct. at 2260, 183 L.Ed.2d at 133–34 (Thomas, J., concurring in judgment) (citation omitted).

■ As noted above, there is no majority opinion of the Court in *Williams*. In general, when interpreting the holding of a United States Supreme Court decision where there is no opinion that commands the support of the majority of the Justices, courts have applied the standard articulated by the Supreme Court in *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260, 266 (1977) (quotation omitted): "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *See Wilkerson v. State*, 420 Md. 573, 594, 24 A.3d 703, 715 (2011); *Grutter v. Bollinger*, 539 U.S. 306, 325, 123 S.Ct. 2325, 2337, 156 L.Ed.2d 304, 330 (2003); *United States v. Rivera–Martinez*, 665 F.3d 344, 347 (1st Cir.2011). In this case, requiring that statements be, at a minimum, formalized to be testimonial is the "position" taken by the five Justices who agreed that the Confrontation Clause was not violated "on the narrowest grounds."

■ The plurality opinion expressed that statements are testimonial when they both have "the primary purpose of accusing a targeted individual of engaging in criminal conduct" and are "formalized statements such as affidavits, depositions, prior testimony, or confessions." 567 U.S. at ——, 132 S.Ct.

at 2242, 183 L.Ed.2d at 116 (plurality). Justice Thomas's concurrence expressed that for statements to be testimonial both "the declarant must primarily intend to establish some fact with the understanding that his statement may be used in a criminal prosecution," 567 U.S. at ——, 132 S.Ct. at 2261, 183 L.Ed.2d at 135 (Thomas, J., concurring in judgment) (citation omitted), and the statements must "bear[ ] [an] indicia of solemnity." 567 U.S. at ——, 132 S.Ct. at 2259, 183 L.Ed.2d at 133 (Thomas, J., concurring in judgment) (quotation omitted). Those statements, Justice Thomas explained, include "formalized testimonial materials, such as depositions, affidavits, and prior testimony, or statements resulting from formalized dialogue, such as custodial interrogation." 567 U.S. at ——, 132 S.Ct. at 2260, 183 L.Ed.2d at 133 (Thomas, J., concurring in judgment) (citations and quotation omitted). The common point of agreement between the plurality opinion and Justice Thomas's concurring opinion is that statements must, at least, be formalized, or have "indica of solemnity" to be testimonial. Therefore, using the *Marks* approach, we conclude that the narrowest holding of *Williams* is that a statement, at a minimum, must be formalized to be testimonial.[15] *See People v. Lopez*, 55 Cal.4th 569, 147 Cal.Rptr.3d 559, 286 P.3d 469, 477 (2012) (In addition to an unsettled primary purpose, "to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity." (citations omitted)); *People v. Dungo*, 55 Cal.4th 608, 147 Cal.Rptr.3d 527, 286 P.3d 442, 449 (2012) ("Although the high court has not agreed on a definition of "testimonial," testimonial out-of-court statements have two critical components.

---

**15.** The plurality's assertion that forensic evidence must be prepared for the "primary purpose of accusing a targeted individual[,]" 567 U.S. at ——, 132 S.Ct. at 2243, 183 L.Ed.2d at 115 (plurality), was expressly rejected by both Justice Thomas's concurring opinion and the dissenting opinion. *See* 567 U.S. at ——, 132 S.Ct. at 2262, 183 L.Ed.2d at 135 (Thomas, J., concurring in judgment); 567 U.S. at ——, 132 S.Ct. at 2273, 183 L.Ed.2d at 148 (Kagan, J., dissenting). Because the plurality opinion's "primary purpose" test has the support of only four Justices it is not an aspect of the narrowest grounds leading to the judgment of the Court.

*First, to be testimonial the statement must be made with some degree of formality or solemnity.* Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution. The high court justices have not, however, agreed on what the statement's primary purpose must be." (Emphasis added)); *cf. State v. Bolden,* 108 So.3d 1159, 1161–62 (La.2012) (per curiam) (determining that "[n]o error under the Confrontation Clause occurs when a DNA expert testifies that in his or her opinion the DNA profile developed from a sample taken from defendant matches the DNA profile developed by other, non-testifying technicians from biological samples taken from the victim of a sexual assault if:" among other conditions, "the report of the [forensic] test results itself is not introduced as a *certified* declaration of fact by the accredited laboratory." (Emphasis added)).[16]

The plurality did not clarify how to determine if a statement is sufficiently formalized to be testimonial. Both the plurality opinion and Justice Thomas's concurring opinion, however, use nearly the same examples of what constitutes sufficiently formalized statements, namely affidavits, depositions, prior testimony, or statements made in formalized dialogue or a confession. *See* 567 U.S. at ——, 132 S.Ct. at 2242, 183 L.Ed.2d at 114 (plurality); 567 U.S. at ——, 132 S.Ct. at 2260, 183 L.Ed.2d at 133 (Thomas, J., concurring in judgment). We, thus, conclude that courts should rely on Justice Thomas's concurrence to determine whether a statement is formalized.

In *Melendez–Diaz* and *Bullcoming,* the Supreme Court established that forensic evidence is testimonial when it either constitutes an affidavit that is "functionally identical to live, in-

---

**16.** We note, additionally, that one legal scholar, Stanford Law School Professor Jeffrey L. Fisher, has concluded that Justice Thomas's concurring opinion, which focuses on the need for a statement to be formalized to be testimonial is "the narrowest in terms of assessing whether forensic reports are testimonial" and "will control future cases involving forensic evidence." *See* Jeffrey Fisher, *The Holdings and Implications of Williams v. Illinois,* SCOTUSblog (June 20, 2012, 2:20 PM), http://www.scotusblog.com/2012/06/the-holdings-and-implications-of-williams-v-illinois/.

court testimony" and is "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," *Melendez–Diaz*, 557 U.S. at 310–11, 129 S.Ct. at 2532, 174 L.Ed.2d at 321 (quotation omitted), or when the forensic evidence was "created solely for an evidentiary purpose ... made in aid of a police investigation ... [,]" *Bullcoming*, 564 U.S. at ——, 131 S.Ct. at 2717, 180 L.Ed.2d at 623 (citation and quotation omitted). Although *Williams* does not overturn either *Melendez–Diaz* or *Bullcoming, Williams* limits the definition of "testimonial" in the area of forensic evidence that, at a minimum, must be sufficiently formalized to be testimonial. *See Williams,* 567 U.S. at ——, 132 S.Ct. at 2243, 183 L.Ed.2d at 115 (plurality) (noting that, consistent with the plurality's standard, in *Melendez–Diaz* and *Bullcoming* the "[i]ntroduction of the reports in those cases ran afoul of the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial"); *Williams,* 567 U.S. at ——, 132 S.Ct. at 2260–61, 183 L.Ed.2d at 134–35 (Thomas, J., concurring in judgment) (stating the differences between the nontestimonial report in *Williams,* which was not formalized, and the testimonial reports in *Melendez–Diaz* and *Bullcoming,* which were formalized).

## B. Present Case.

First, we determine what out-of-court statements were offered by the State. Luttman presented as her final conclusion "that specimen K10 [the DNA specimen from Derr's sample], which is Norman Derr, is the source of the DNA found on specimens Q 15 and Q 16 [the vaginal swabs] to a reasonable degree of scientific certainty." As the basis for that conclusion, Luttman presented the results from: (1) the 1985 serological examination of biological material on the vaginal and other swabs taken from the victim; (2) the 2002 DNA test of biological material extracted from the vaginal, anal, and genital areas of the victim; (3) the 2004 DNA test of biological material extracted from the inside of Derr's cheek; and the

2006 DNA test on biological material extracted from the insides of Derr's brothers' cheeks.

During trial, Derr challenged the admission of the results from the 1985 serological examination, the 2002 DNA test, and the 2004 DNA test as violating the Confrontation Clause. Over Derr's objection, the court admitted the results of those three tests.[17] And, on appeal, Derr once again challenges the introduction of the results from the serological exam and the DNA tests. Thus, his challenges to the three forensic test results are preserved.

As noted many times throughout this opinion, under *Crawford,* the Confrontation Clause is only implicated when a statement is *both* testimonial and offered for its truth. And, as noted above, applying the narrowest holding in *Williams,* forensic evidence must be at least formalized to be testimonial. Because we determine that none of the challenged forensic test results are sufficiently formalized within the meaning of the plurality and Justice Thomas's concurring opinions, we further conclude that none are testimonial. And, because none of the test results are testimonial, the introduction of the results does not implicate Derr's right of confrontation.[18]

▇▇▇ Notably, the serological exam results are not sufficiently formalized to be testimonial. The exhibit in the record pertaining to the serological examination appears to be the notes from the bench work of the serological examiner. There

---

17. While Derr also objected to the introduction of the 2006 DNA test results, the record indicates that his objection to those results rested on the argument that Derr's brothers' Fourth Amendment rights were violated. That issue is not before us, as it was not raised on appeal in this case. Because Derr did not object to the admission of the results from the 2006 DNA test as violating his right of confrontation, a challenge on those grounds is not preserved.

18. Because forensic evidence must be both testimonial and hearsay to implicate the Confrontation Clause, and we conclude that the forensic evidence at issue in the present case was not testimonial, whether the forensic evidence was offered for its truth would not affect our determination that Derr's right of confrontation was not violated, and we do not reach that issue.

are no signed statements or any other indication that the results or the procedures used to reach those results were affirmed by any analyst, examiner, supervisor, or other party participating in its development. Like the Cellmark report at issue in *Williams,* the serological examiner's notes "lack[ ] the solemnity of an affidavit or deposition, for [they are] neither a sworn nor a certified declaration of fact[,]" nothing on the notes "attest[s] that [their] statements accurately reflect the . . . testing processes used or the results obtained[,]" there is no signed statement from a person who did the test or someone "certify[ing] the accuracy of those who did" and, although the serological examination was performed "at the request of law enforcement," the results are "not the product of any sort of formalized dialogue resembling custodial inter-rogation." *Williams,* 567 U.S. at ——, 132 S.Ct. at 2260, 183 L.Ed.2d at 133–34 (Thomas, J., concurring in judgment).

Similarly, we conclude that the results from the 2002 DNA test are not sufficiently formalized to be testimonial. The 2002 forensic results of the biological material on the vaginal, anal, and genital swabs admitted as evidence display a series of numbers and lines, and on the bottom of the docu-ments are the initials of two parties. No statements, however, appear anywhere on the results attesting to their accuracy or that the analysts who prepared them followed any prescribed procedures. When Justice Thomas distinguished the results in *Williams* from those found to be testimonial in *Melendez–Diaz* and *Bullcoming,* he noted that the reports at issue in *Melendez–Diaz* were "sworn to before a notary public by the analysts who tested a substance for cocaine" and the report at issue in *Bullcoming* "though unsworn, included a Certificate of Analyst signed by the forensic analyst who tested the defen-dant's blood sample" and the analyst affirmed the proper handling of the sample, that the statements in the report were correct, and that the analyst had "followed the procedures set out on the reverse of the report." *Williams,* 567 U.S. at ——, 132 S.Ct. at 2260, 183 L.Ed.2d at 134 (Thomas, J., concurring in judgment) (quotations omitted). Justice Thomas further concluded that "what distinguishes the two [results in *Bull-*

*coming* and *Williams* ] is that Cellmark's report [at issue in *Williams* ], in substance, certifies nothing." *Id.* Similarly, although there are initials on the bottom of the 2002 DNA test results, there are no statements providing any certifications. Thus, we conclude that the 2002 DNA test results are not sufficiently formalized to meet the requirements set out in *Williams*.

 Finally, we conclude that the 2004 DNA test results lack the solemnity to be testimonial under *Williams*. The results in the record for the 2004 DNA test of biological material on Derr's buccal swab are almost identical in form to the test results from the 2002 DNA test of biological material on the vaginal, anal, and genital swabs. The only apparent difference is that there are no initials on the bottom of the documents bearing the 2004 results. Thus, like the results from the 2002 DNA test and the 1985 serological examination, the results from the 2004 test lack sufficient formality to be testimonial.

As stated above, Luttman's in-court testimony was subject to cross-examination. The forensic test results presented as the basis for her in-court testimony are not testimonial under the *Williams* decision. Therefore, we conclude that Derr's right to confront witnesses was not violated in this case.[19] And, although Luttman lacked first-hand knowledge that the results admitted were attributed to the swabs taken from the victim or from Derr, or that proper procedures were followed to ensure the accuracy of the results, this lack of firsthand knowledge goes to the weight of the evidence, not its admissibility.

---

19. In the present case, Derr has argued violations of the Confrontation Clause and his right to discovery, that the evidence presented was insufficient, and that the trial judge erred by refusing to give a requested instruction, and so we address those issues. We note, however, that compliance with the Confrontation Clause is only one requirement for evidence to be admissible at trial, and will not cure a violation of, for example, the Maryland Rules of Evidence.

## II. Right to Discovery

On February 21, 2006, Derr filed a pretrial motion to compel the State to "produce statistics on matching and near-matching profiles maintained in the CODIS DNA database." Arguing that the validity of the match in CODIS was the "key point of this case," and that a prior search of the Arizona state database finding coincidental matches at nine loci or more, when the FBI methodology predicated none, indicated that the "FBI's statistical model used to generate 'source attribution' is flatly erroneous[,]" the motion asserted that "the State must either provide the requested discovery, or its expert must be excluded from rendering any opinions based on a deeply flawed methodology." The motion then requested: (1) "[a] report of the size of the FBI CODIS database at the time of the search in this case[;]" (2) "[a] report listing all the current pairwise matches, at 9 or more loci, between DNA profiles within the FBI CODIS database searched in this case[;]" (3) "[a]ny statistical or research information in the possession of the FBI about the significance of matches within the CODIS database of DNA profiles[;]" and (4) "[c]opies of procedures, protocols, or written directives of any kind about how the FBI CODIS database prevents entry of duplicate profiles."

On March 7, 2006, the Circuit Court held a pretrial hearing where it addressed, among other things, Derr's motion requesting discovery. After both parties presented arguments, the trial judge denied "the motion to compel the State to produce the statistics on matching or near matching profiles in the [CODIS] DNA database." The trial judge reasoned that because "[t]here has never been a 13 [loci] coincidental match between two people other than identical twins," the judge agreed with the State, "that there is no reasonable likelihood that the information requested would produce any helpful or exculpatory information."

Derr argues, in his brief, that in the present case the DNA evidence was "unquestionably" persuasive because "the *only* witness to identify [Norman] Derr" was Luttman, "who testi-

fied that within a 'reasonable degree of scientific certainty' [Norman] Derr was the source of the sperm recovered from [the victim] ... based ... on the match between [Norman] Derr's DNA profile and the DNA profile derived from the vaginal swabs ... and the rarity of the forensic DNA profile, which Ms. Luttman described in astronomical terms...." (Emphasis in original). Derr asserts that to "rebut the State's evidence, [Norman] Derr had to establish—in a comprehensible way—that the source of the DNA evidence was *outside* of the database, and show that the statistic relied upon by the prosecution to generate the inference that such a coincidence had not occurred was misleading." (Emphasis in original). Derr contends that while, "in theory" he had the opportunity to cross-examine Luttman's conclusions, that opportunity was not meaningful unless Derr could "convey to a lay jury the counterintuitive notion that a search of a large DNA database with a rare profile increases the chance that a coincidental match will occur, and that the random match probability does not accurately or reliably predict that outcome, even for an exceedingly rare profile, *i.e.*, one with an infinitesimally small random match probability." (Emphasis in original) (Citations and footnote omitted). Derr, therefore, argues that he "needed *concrete examples* of the number of coincidental matches within the FBI's CODIS database," and "[e]vidence of unexplained matches in [CODIS], whether at 9, 10, 11, 12, [or] 13 loci, would have enabled cross-examination of Ms. Luttman about the FBI's refusal to consider error rates, the size of the population databases from which the random match probabilities are derived, the prevalence of population sub-structuring, and other assumptions that underlay the State's assertion that to a 'reasonable degree of scientific certainty' the DNA recovered from the [victim] came from [Norman] Derr." (Emphasis in original) (Citations and footnote omitted). Therefore, Derr asserts in his brief that "it was incumbent upon the court to enforce [his] statutory and constitutional rights to receive relevant or exculpatory discovery for the purpose of preparing his cross-examination of Ms. Luttman's scientific opinion." (Citations and footnote omitted)

 Noting that what Derr is essentially requesting is that the FBI conduct a research project, the State argues that Derr is not entitled to this discovery under either the Constitution, as provided by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny, or the Maryland Rules, namely Rule 4–263. The State contends that in *Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 289 (1988) the Supreme Court "distinguished between *Brady* material and 'evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant[,]' " and that under that case, "the State is under no particular duty to preserve the latter, let alone to (as Derr demands) create it. . . . " The State further contends that "[n]o provision of [Md. Rule 4–263] . . . extends to the right to demand that an outside agency engage in basic research." The State highlights that what Derr is requesting from the FBI, evidence to undermine the "product rule" method for determining the rarity of a DNA profile, which this Court approved in *Armstead v. State,* 342 Md. 38, 82–83, 673 A.2d 221, 243 (1996), "is a scientific experiment wherein all of the millions of DNA profiles in the CODIS database would be compared to one another to see how many of them matched at 9 loci or more." (Footnote omitted). To make this search useful, the State asserts, the FBI would need to refine the results significantly, which the State contends would require the FBI to "devote massive computer resources[,]" and would take a significant amount of time.[20]

---

**20.** The State also argued that a state court cannot compel discovery from a federal agency. To the extent that this argument asserts that *Brady* material and other discovery disclosures mandated by Md. Rule 4–263 are insulated from discovery because the evidence is in the possession of a federal agency, we strenuously disagree. When the State works closely enough with a federal agency, as defined by the standard adopted by this Court in *Diallo v. State,* 413 Md. 678, 709, 713, 994 A.2d 820, 838, 841 (2010), the State will be held to have "constructive possession" of *Brady* material possessed by the federal agency and the failure to produce such evidence constitutes a violation. The State asserts that "[t]he fact that the FBI was assisting state authorities in a state criminal investigation does not render FBI files

We hold that the trial court's refusal to order the FBI to conduct a research project and create potentially useful evidence for Derr does not violate either his constitutional right to discovery, as defined by *Brady* and its progeny, or Maryland Rule 4–263. Nothing in the record we are aware of indicates that the FBI has in its possession evidence of coincidental matches in CODIS. In fact, during trial, Luttman testified both that she did not know of any DNA profiles matching at thirteen loci, the level Derr was identified at, other than with identical twins, and that the FBI has never looked for "cross-wise pairs matches at 13 loci" in CODIS. *Brady* prohibits "the *suppression* by the prosecution of evidence favorable to an accused . . . [,]" 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218 (emphasis added), and there is no basis for this Court to conclude that the State has suppressed evidence of coincidental matches in the present case. Additionally, Maryland Rule 4–263, as it was in effect at the time of the pretrial hearing and the trial, required the State to produce significant discovery to Derr but did not require the State to conduct a significant research project that could potentially create exculpatory material or information for Derr.[21]

*Brady v. Maryland* established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is

---

and data within a state court's power to compel [disclosure of the files and data]." It is beyond question, however, that it is *within* a state court's power to impose appropriate remedies and sanctions if the failure to disclose those files or data violates a rule of discovery or a defendant's constitutional rights. *See Williams v. State,* 416 Md. 670, 698–99, 7 A.3d 1038, 1054 (2010).

21. Although Section 10–915 of the Courts and Judicial Proceedings Article, both at the time of Derr's trial in 2006 and now, requires the production of certain discovery before the use of DNA to identify a person, the statute does not require the State to conduct research to discover potentially useful information for defendants or allow defendants access to all of the data in CODIS to run their own searches. *See* Md.Code (1973, 2013 Repl.Vol.), § 10–915 of the Courts and Judicial Proceedings Article; Md.Code (1973, 2006 Repl.Vol.), § 10–915 of the Courts and Judicial Proceedings Article.

material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218; *see also Dulyx v. State,* 425 Md. 273, 288 n. 7, 40 A.3d 416, 425 n. 7 (2012); *Williams v. State,* 416 Md. 670, 691, 7 A.3d 1038, 1050 (2010). As we have stated, "[t]o establish a *Brady* violation, Petitioner must establish three necessary components: (1) that the prosecutor suppressed or withheld evidence that is (2) favorable to the defense—either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness—and (3) that the suppressed evidence is material." *Diallo v. State,* 413 Md. 678, 704, 994 A.2d 820, 835 (2010) (quotation omitted); *see also Yearby v. State,* 414 Md. 708, 717, 997 A.2d 144, 149 (2010). We have further noted, "[s]uppressed evidence, for *Brady* purposes, is information which had been known to the prosecution but unknown to the defense." *Diallo,* 413 Md. at 704, 994 A.2d at 835 (quotation omitted). To show that the State has suppressed evidence, a defendant must "demonstrate that the evidence was in the *possession* of the prosecution, or someone working on its behalf, and that the prosecution did not produce the evidence to the defense." *Diallo,* 413 Md. at 705, 994 A.2d at 836 (emphasis added); *see also Williams,* 416 Md. at 692, 7 A.3d at 1050 ("In order to establish a *Brady* violation, [the] petitioner must prove that the State suppressed favorable evidence"). The prosecution has "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490, 508 (1995); *see also Diallo,* 413 Md. at 707, 994 A.2d at 837. As noted above, in the present case, however, Derr has not shown that the State, the FBI, or any other party working with the State, had knowledge or evidence of coincidental matches that could be used to undermine Luttman's testimony. Thus, Derr has failed to show that the State suppressed evidence, and "there can be no *Brady* violation where there is no suppression of evidence." *Diallo,* 413 Md. at 706, 994 A.2d at 836 (quotation omitted).[22]

---

**22.** Derr has highlighted to both the trial court and in his brief on appeal, that the results of studies by the National Research Council of

Maryland Rule 4–263 requires the production of *Brady* material. *Williams,* 416 Md. at 693, 7 A.3d at 1051 (citing *Yearby,* 414 Md. at 720 n. 8, 997 A.2d at 151 n. 8). To the extent that it requires disclosures beyond *Brady* in the present case, it does not require the State to engage in extensive research projects on behalf of criminal defendants that could potentially produce useful evidence. Maryland Rule 4–263 is a rule of procedure. "[T]o ascertain the meaning of a . . . rule of procedure we first look to the normal, plain meaning of the language." *Duckett v. Riley,* 428 Md. 471, 476, 52 A.3d 84, 87 (2012) (quotation omitted). By its plain language, the 2006 version of Rule 4–263 required, among other things, that the State produce: "[a]ny material or information tending to negate or mitigate the guilt or punishment of [Derr] as to the offense[s] charged;" "[a]ny relevant material or information regarding . . . pretrial identification of the defendant by a witness for the State[;]" and "the name and address" of State witnesses. As noted above, there is no evidence provided in this case that the State, or the FBI, has in its possession and has failed to disclose evidence of coincidental matches in CODIS. And nothing in the language of Maryland Rule 4–263 indicated that Derr could compel the State, or the FBI, to create such evidence.

Derr, in his reply brief to this Court, and in his rebuttal at oral argument before this Court, argued that what he was really requesting was not for the FBI to find coincidental matches but for the FBI to give him the data in CODIS for

the National Academy of Sciences, the FBI's DNA Advisory Board, and a search of the Arizona database showing coincidental matches all indicate that there is an increased chance of a coincidental match when the State is "trawling," or running a DNA profile through CODIS to search for a match. He further noted in his appellate brief that findings of coincidental matches similar to the ones in Arizona have been made since Derr's trial with relation to the Illinois database and the database in Maryland. There is no evidence, however, that the State suppressed this information at trial. Rather, the record indicates that Derr had access to the evidence of coincidental matches in Arizona, and the reports of the National Research Council and the DNA Advisory Board at trial.

his own experts to run searches for matches.[23] This does not appear to be what was requested in Derr's motion.[24] Assuming *arguendo*, that access to the data in CODIS to run his own searches is what Derr really sought, his rights under *Brady* and Rule 4-263 are still not violated. Derr has provided no authority that persuades this Court that *Brady* requires the FBI to give him access to all of the data in CODIS to run his own search. And while Rule 4-263 requires the disclosure of relevant material in the State's possession, it does not give Derr the right to search CODIS for potentially helpful information.

### III. Sufficiency of the Evidence

Derr argues that there was "insufficient evidence as a matter of law to sustain [Norman] Derr's convictions when the sole evidence that identifies him is a random [match] probability statement that does not account for a false positive match." Derr further asserts that in this "cold hit" case in which the DNA match made Derr the suspect and "there [was] no other

---

23. 42 U.S.C. § 14132(b)(3) provides that a criminal defendant is entitled to "access to samples and analyses performed *in connection with the case in which such defendant is charged* [.]" (Emphasis added). This statute, which governs the disclosure of information in CODIS, however, does not expressly provide to criminal defendants access to information about all DNA samples taken and analysis done in other cases. For example, the Federal Bureau of Investigation has stated that the provision in 42 U.S.C. § 14132(b)(3) that gives a criminal defendant access to information related to his or her case "does not authorize access for the defendant to samples and analyses that were not developed in connection with his or her case (such as other offenders' DNA profiles)[, n]or does this provision ... authorize access for the defendant to all of the DNA records in the National DNA Index System [the national level of CODIS "containing the DNA profiles contributed by federal, state, and local participating forensic laboratories"]." *See* Federal Bureau of Investigations, *Frequently Asked Questions (FAQs) on the CODIS Program and the National DNA IndexSystem, available at* http://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-fact-sheet (last visited August 5, 2013).

24. In his February 21, 2006 motion, Derr noted that he is asking the FBI to disclose "only the number of matches within the database at 9 loci or greater[,]" and that he "requests that the State seek matches at 9 or more loci in the CODIS database[.]"

evidence that identifie[d] [Derr] to the exclusion of other white males of typical height and weight who were present in 1984[in] the area of southern Maryland[,] [t]he absence of other evidence makes the DNA evidence, and the proper statistical presentation of that evidence, all the more important." (Citations omitted). Derr additionally contends that the "State's random match probability statistic [used in this case] had limited value because it did not account for the much larger error rate or quantify the probability of a coincidental match from a trawl of a DNA database[,]" and noted that Luttman testified that in determining the random match probability she "did not account for laboratory error, administrative error, or describe the probability of finding a coincidental match within a DNA database." Derr argues that "[w]ithout the estimation of laboratory error rate factored into the random match probability, and without quantification of the probability of a coincidental match from a trawl of a database, the trial court could not determine whether the evidence 'amount[ed] only to strong suspicion or mere probability[,]'" (quoting *Taylor v. State*, 346 Md. 452, 458, 697 A.2d 462, 465 (1997) (further citation omitted)), and, therefore, "as a matter of law, and as a matter of fundamental due process . . . the random match probability evidence relied upon by the State to identify [Norman] Derr as the perpetrator of the 1984 sexual assault was not sufficient to sustain his convictions."

The State replies that "at best . . . [Derr's] arguments go to the weight of the evidence, not its sufficiency. . . ." The State further argues that its "burden is simply one of production—of showing that evidence was produced from which the finder of fact could reasonably find the necessary elements of the crime." The State concludes that "in order to prevail in his challenge, Derr must demonstrate that no rational finder of fact could believe the results of a DNA test, either because it was conducted by human beings who were capable of error, or because his DNA profile was discovered in the CODIS database. He has not come close to establishing either contention."

When determining whether the State has presented sufficient evidence to sustain a conviction, we have adopted the Supreme Court's standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979) (emphasis in original) (citation omitted), namely, "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Yates v. State*, 429 Md. 112, 125, 55 A.3d 25, 33 (2012), *Titus v. State*, 423 Md. 548, 557, 32 A.3d 44, 49–50 (2011). In applying this standard we have stated:

> The purpose is not to undertake a review of the record that would amount to, in essence, a retrial of the case. Rather, because the finder of fact has the unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony, we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence. We recognize that the finder of fact has the ability to choose among differing inferences that might possibly be made from a factual situation, and we therefore defer to any possible reasonable inferences the trier of fact could have drawn from the admitted evidence and need not decide whether the trier of fact could have drawn other inferences from the evidence, refused to draw inferences, or whether we would have drawn different inferences from the evidence.

*Titus*, 423 Md. at 557–58, 32 A.3d at 50 (quotations and citations omitted).

Derr's sufficiency of the evidence argument appears to be in reference to whether there was enough evidence to identify him as the victim's attacker, or in other words, whether Derr's criminal agency was proven.[25] The victim

---

25. We note that the testimony of the victim, that she was forced at knife point to undress, that her attacker fondled her breasts, kissed her, performed oral sex upon her, and "put his penis in [the victim's] vagina and began intercourse," would be sufficient for a rational juror to be convinced beyond a reasonable doubt of the criminal acts or *corpus*

described to the jury that her attacker was "a white male, a stocky build" with "light brown hair, blue eyes, mustache" who was "5'8" to 5'10", something like that." Additionally, during closing arguments, the prosecutor stressed the similarities between the composite sketch the victim helped the police create in 1984 and the pictures of Derr from 1982 and 1986. Based on this evidence, Derr could not be excluded as the potential attacker. As the investigating officer noted on cross-examination, however, a lot of people could have fit the description provided by the victim. Additionally, the victim never identified Derr as her attacker. Therefore, the key testimony in the case identifying Derr as the attacker was Luttman's testimony of the match between Derr's DNA and the DNA extracted from biological material on the vaginal swabs.

The match identifying Derr as the attacker was circumstantial evidence, or "testimony about or physical evidence of a fact from which the fact finder must infer what happened during the event in controversy." 5 Lynn McLain, Maryland Practice: Maryland Evidence State and Federal § 300:4 at 289 (2001). As we have noted:

> Circumstantial evidence may support a conviction if the circumstances, taken together, do not require the trier of fact to resort to speculation or conjecture, but circumstantial evidence which merely arouses suspicion or leaves room for conjecture is obviously insufficient. It must do more than raise the possibility or even the probability of guilt. It must afford the basis for an inference of guilt beyond a reasonable doubt.

*Taylor v. State*, 346 Md. 452, 458, 697 A.2d 462, 465 (1997) (quotation omitted).

In the present case, Luttman testified to the jury that the DNA profile derived from the biological material on the vaginal swabs taken from the rape victim and the DNA profile

---

*delicti* for first degree rape, second degree rape, first degree sexual offense, and second degree sexual offense.

that came from Derr matched at all thirteen loci. Luttman further testified that the results from the serological examination and the results from the 2002 DNA tests both indicated that there was semen on the swabs taken from the victim. She also testified that when she compared the DNA profile derived from Derr's brothers' samples, there was no match to the DNA on the biological material found on the swabs of the rape victim and so the brothers could be excluded. Finally, Luttman testified that using the FBI's methodology, she concluded that the probability of another person having that same DNA profile and being the source of the DNA, other than Derr, was more than 1 in a quadrillion, and, thus, she could conclude that Derr was the "source of the DNA found on [the vaginal swabs] to a reasonable degree of scientific certainty."

From Luttman's testimony, a rational juror could conclude beyond a reasonable doubt, without resorting to speculation or conjecture, that Derr was the victim's attacker, and that is how his semen was found on her. Studies calling into question the methodology used by Luttman, and her failure to take into consideration the potential for laboratory error could all undermine her conclusion. These issues, however, go to the weight of the evidence and whether the jurors should believe Luttman's conclusion. In *Branch v. State*, 305 Md. 177, 502 A.2d 496 (1986), the defendant was convicted of robbery after being identified by the victim by photograph and in court. 305 Md. at 178–79, 502 A.2d at 496–97. During trial, the defense called into question the victim's identification, establishing that the physical description that the victim gave soon after the robbery was inconsistent with how the defendant actually looked. 305 Md. at 179–81, 502 A.2d at 497–98. We concluded, however, that this inconsistency went to the weight of the evidence, not its sufficiency and upheld the conviction. 305 Md. at 184, 502 A.2d at 499. The testimony given by Luttman connecting Derr to the DNA extracted from the biological materials on the vaginal, anal, and genital swabs, along with, to a lesser degree, the relative match between the composite sketch and his pictures from 1982 and 1986, serve

as sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that Derr was the victim's attacker.

### *IV. Jury Instruction*

■ In the present case, Derr proposed a jury instruction defining what it means for an expert witness to testify to "a reasonable degree of scientific certainty" which the trial judge denied. At trial, the judge read jury instructions to the jurors and gave a copy of the instructions to each juror. While Derr's requested instruction was not included among the jury instructions, the trial court gave a number of instructions derived from the Maryland Pattern Jury Instructions.

Derr contends that the *"only* witness to identify [Norman] Derr as the person who raped [the victim] was . . . Luttman, who testified on direct examination that 'to a reasonable degree of scientific certainty' [Norman] Derr was the source of the sperm recovered from [the victim]." (Emphasis in original). Derr argues that "[i]n the circumstances of this case, where the expert opinion was the *sole* basis for convicting [Norman] Derr, and the opinion was based on a legal term of art that was not otherwise defined by the instructions provided by the court, it was essential to [Norman] Derr's receipt of a fair trial for the jury to fully understand this term." (Emphasis in original). Finally, Derr asserts that the trial judge erred in not giving the instruction because a jury must decide whether to accept, and what weight to give, "the expert opinion testimony." He contends that "[t]he basis, quality, strength, sincerity, and bias of an expert opinion are matters of credibility for the jury to determine, and it was therefore necessary for the jury to be instructed on the legal term Ms. Luttman used to characterize (and buttress) her opinion."

The State notes that under Maryland Rule 4–325, "[a]ssuming that an instruction is fairly generated by the evidence, the court is only required to give instructions that accurately state the law, that are not adequately covered by other instructions, and that relate to the law, as opposed to the weight of

evidence." The State contends that "Derr's proposed instruction fails on all counts."

 We conclude that the trial judge did not err in refusing to give Derr's requested instruction defining "reasonable degree of scientific certainty." As we have stated:

> A trial court must give a requested jury instruction where (1) the instruction is a correct statement of law; (2) the instruction is applicable to the facts of the case; and (3) the content of the instruction was not fairly covered elsewhere in instructions actually given. We review a trial court's decision whether to grant a jury instruction under an abuse of discretion standard. On review, jury instructions [m]ust be read together, and if, taken as a whole, they correctly state the law, are not misleading, and cover adequately the issues raised by the evidence, the defendant has not been prejudiced and reversal is inappropriate. Reversal is not required where the jury instructions, taken as a whole, sufficiently protected the defendant's rights and adequately covered the theory of the defense.

*Cost v. State,* 417 Md. 360, 368–69, 10 A.3d 184, 189 (2010) (citations and quotations omitted); *see also* Md. Rule 4–325(c) (noting that "[t]he court need not grant a requested instruction if the matter is fairly covered by instructions actually given"). Derr argues that the jury instruction was necessary so that jurors could adequately assess Luttman's credibility when she gave her conclusion that Derr was the source of the DNA found on the victim. The instructions given, however, adequately covered this issue.

Each juror was instructed, pursuant to Pattern Jury Instructions 2:00, 2:01, and 2:02, that Derr was presumed innocent, that each juror has a duty to decide the facts for himself or herself, and that after considering the evidence with the other jurors, each juror must decide the case for himself or herself. Pursuant to Pattern Jury Instruction 3:00, jurors were instructed that when deciding the case, they must consider the evidence. Pursuant to Pattern Jury Instruction 3:10, the members of the jury were told that they are "the sole

judge[s] of whether" witnesses, such as Luttman, "should be believed," that they need not believe a witness even if the witness's testimony was uncontradicted, but that they should consider whether testimony was supported or contradicted by the evidence that the juror believed and that the juror "may believe all, part or none of the testimony." Pursuant to Pattern Jury Instruction 3:14, each juror was instructed that he or she "should give expert testimony the weight and value you believe it should have[,]" that the juror is "not required to accept an expert's opinion[,]" and that the juror "should consider an expert's opinion together with all the other evidence." Finally, pursuant to Pattern Jury Instruction 3:15, each juror was instructed that they should decide how much weight to give to the scientific test results that in this case formed the basis for Luttman's conclusion.

Taken together, these instructions informed jurors that they should consider the evidence, including the test results, and all of the testimony, including Luttman's, and decide for themselves whether to accept Luttman's conclusion. The fact that Luttman said her conclusion was to a "reasonable degree of scientific certainty" does not change the fact that each juror was instructed to decide for himself or herself if the juror trusted the validity of the test results, agreed that Derr's semen was found on the victim, and if so, whether it was sufficient to convince the juror that Derr was guilty of the charged crimes. The instructions given sufficiently protected Derr's right to have the jury judge the credibility of all the evidence including Luttman's testimony. Thus, the trial judge did not err in refusing to grant Derr's request for the additional jury instruction.

### V. *Conclusion*

In the present case, Derr's right to confront witnesses against him was not violated. Additionally, the State did not violate the requirements of either *Brady* or Maryland Rule 4–263. Furthermore, the evidence presented to the jurors was sufficient for a rational juror to find Derr guilty of the crimes for which he was convicted. Finally, the trial judge did not

commit an error in refusing to give the jury instruction Derr requested. Because we conclude that, based on the issues before us, there was no constitutional or other legal infirmity in the present case, we affirm Norman Derr's convictions.

**JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

HARRELL, ADKINS and McDONALD, JJ., concur.

BELL, C.J. and ELDRIDGE, J. dissent.

ADKINS, J. concurring.

Derr argues that the circuit court's "denial of [his] right of cross-examination was compounded by the improper denial of discovery." He contends that the trial court, in allowing the State to characterize the rarity of a DNA match but not allowing Derr discovery concerning the number of coincidental matches in the CODIS database, was error. Derr claims injury in that "discovery of the number of coincidental matches in the FBI's CODIS database ..., in all likelihood, would have placed the limitations and shortcomings of the RMP[1] in concrete terms for the jury to understand and evaluate."

In addition to the *Brady* arguments addressed by the Majority, he bases this claim upon Md. Rule 4–263, and the Fifth, Sixth, and Fourteenth amendments of the Federal Constitution, as well as, Articles 21 and 24 of the Maryland Declaration of Rights. Although the Majority's *Brady* ruling may be in accord with traditional *Brady* analysis, the Majority fails to appreciate the fact that a *Brady* violation is not the sole method by which a criminal defendant's right to due process may be violated. Due process is broader than just the prosecutorial suppression of evidence, it encompasses the entirety of a criminal defendant's right to a fair trial. *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942

---

1. RMP is used to mean "random match probability."

(1955) ("A fair trial in a fair tribunal is a basic requirement of due process."). By basing its constitutional due process analysis solely on *Brady*, I am concerned that the Majority's opinion may be construed as an endorsement of the notion that refusal of discovery of RMP's in the CODIS database is always sacrosanct. With increased use by the state of partial matches (less than 13 locii) to prove a suspect's connection to the crime, I have serious concern that denying a defendant discovery about coincidental matches in the CODIS database may so undermine his defense that a denial of due process may sometimes result.

In the typical DNA-based case, the State presents its expert witness to state the rarity of any given DNA profile through use of the CODIS database. Yet, because that database is off-limits to defendants and the public, absent discovery, the defense has no method to test the validity of these statistics. There is no DNA database other than CODIS that can be used by defense counsel to generate its own tests regarding the rarity of a DNA match. In other words, the State has exclusive rights to use the only existing database that could provide a testing of the RMP that may be crucial to a defense.

Derr's request for discovery about the frequency of random matches in the CODIS database raises these concerns. I concur, rather than dissent, however, because the State limited its proof to instances of full 13 locii matches as evidence that Derr's DNA was found on the rape victim. Expert witness Jennifer Luttman testified that there was a one in 240 quadrillion chance of finding another person whose DNA matched at 13 locii. I am persuaded that, when all 13 locii match, there is virtually no likelihood that a random match could be found, and so discovery of random matches in the CODIS database will not prove fruitful for the defense. *See Young v. United States,* 63 A.3d 1033, 1051 (D.C.2013) ("[T]here is no 'real basis' to question the correctness of the government's statistics or expect data on pairwise matches in NDIS to undermine the FBI's calculation of a RMP based on a thirteen-locii match.")

This is exactly what the trial court decided:

I . . . deny the defendant's motion in limine to exclude the State's expert from testifying as to the source attribution and rarity of forensic data profile. And also deny the motion to compel the State to produce the statistics on matching and near matching profiles in the Codus [sic] DNA database. I agree with the State that there is no reasonable likelihood that the information requested would produce any helpful or exculpatory information. The science certainly does not, as this time, support their contention. There has never been a 13 locus coincidental match between two people other than identical twins. Ant's Apx at 248.

I would affirm the trial court on this basis.

Yet, I write separately to emphasize that we must remain vigilant, and as future cases unfold, refrain from being predisposed against defense efforts, in the proper case, to make the state disgorge information valuable to the defense about CODIS. Although it may be almost impossible for a full 13 locii match to produce a random identification of someone other than the person who committed the crime, the same cannot be said of partial matches. The value of DNA evidence rests exclusively on statistical conclusions and probabilities, which become less certain as the number of matching locii decreases. When fewer locii are matched, the probability of finding a random match of DNA that does *not* belong to the guilty person may become unacceptably large in the view of the trier of fact. In order to prove this, however, a defendant needs to have access to the necessary evidence to persuade the judge or jury.

Recognizing that the existence of a high probability of returning coincidental matches could compromise our criminal justice system, courts and scholars alike have begun to acknowledge the need for more scientific study into DNA testing to guarantee that the RMPs of certain locii matches is what the government claims them to be. The District of Columbia Court of Appeals, for example, although denying requested discovery about CODIS, recognized the importance of making sure that the theorized RMPs match reality:

> Researchers have studied the match frequencies found in offender databases ... to determine whether they in fact imply that the foundations of the formula for calculating RMP's need to be reconsidered.... The studies are not conclusive; questions remain. Reputable scientists and scholars have argued that it would be desirable as a matter of policy and scientific accuracy to investigate the frequency of matches in very large databases such as NDIS in order to determine whether the theorized amplification of slight deviations from allelic independence across multiple loci affects the accuracy of RMP calculations based on the product rule.

*Young*, 63 A.3d at 1055–56. Likewise, several scholars have made cogent arguments for the importance of more testing, explaining why the Federal government's claims of the need for secrecy about CODIS are not persuasive. *See* Sarah M. Ruby, *Checking the Math: Government Secrecy and DNA Databases*, 6 I/S: J.L. & Pol'y for Info. Soc'y 257, 290–316 (2010); *see also* D. Kaye, *Trawling DNA Databases For Partial Matches: What is the FBI Afraid Of?*, 19 Cornell J.L. & Pub. Pol'y 145 (2009). The Ruby article, for example, concludes:

> Ideally, statistical tests would show that current estimates as to the rarity of DNA profiles are accurate. However, if DNA profiles are not as rare as current statistics portray them to be, untold numbers of convictions could be compromised. This is not a reason to allow potentially faulty science to remain unexamined, it is a question that demands an answer. Yet, none outside government has access to the tools necessary to provide one. If law enforcement agencies continue to resist scrutiny of offender DNA profiles, reasonable judges should take action through the imperfect venue of a criminal trial.

Ruby, at 316.

No doubt, some of the public policy changes advocated by these and other commentators, conflict with existing federal statutes, and thus, compelling disclosure of the federal CODIS

database will be beyond the scope of our jurisdiction. Yet, they raise important questions highlighting the absence of proof regarding the accuracy of current RMP calculations, especially concerning partial DNA matches. It may be the case, that when the State attempts to connect a defendant to a crime through the use of a partial DNA match, the probability of returning a coincidental match in the CODIS database becomes unacceptably high to the point at which denial of this information will violate the defendant's right to due process. In such circumstances, we at least have the option of excluding the DNA evidence, absent proper discovery.

I concur in the majority opinion, but add a caveat: we should be alert for the case when the government's need for secrecy is outweighed by the defendant's right to a fair trial that is guaranteed by the Fifth, Sixth, and Fourteenth Amendments, as well as, Articles 21 and 24 of the Maryland Declaration of Rights.

Judge HARRELL authorizes me to state that he agrees with the views set forth herein.

McDONALD, J., concurring.

On behalf of the majority, Judge Greene has taken on the unenviable task of deriving a rule from the splintered opinions in *Williams v. Illinois,* —— U.S. ——, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). I concur in the result reached in the majority opinion, but write separately because I question whether the rationale of the opinion will ultimately be embraced by the Supreme Court.

The majority opinion follows the direction of the Supreme Court as to how to construe one of its decisions when no single opinion commands a majority of that Court: find the narrowest rationale common to opinions endorsed by a majority of the justices.[1] Our majority adopts the suggestion of Professor Fisher that the narrowest holding to be derived from

---

[1]. *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).

*Williams* is that only "formal" or "solemn" statements qualify as "testimonial" and therefore subject to the Confrontation Clause. Majority Op. at p. 116 & n. 17, 73 A.3d at 270–71 & n. 17. Professor Fisher's theory has been criticized as giving undue weight to Justice Thomas' unique approach to the Confrontation Clause.[2] It appears to me that, instead of the narrowest holding, Professor Fisher has latched upon the narrowest definition of "testimonial hearsay," which has the effect of broadly exempting forensic reports and other documents from the purview of the Confrontation Clause. It is not clear to me that this is the narrowest "holding" one can derive from the opinions in *Williams*.[3]

Having said all that, I do not have an alternative unified theory to offer. It does appear to me, however, that the evidence at issue in this case is fairly indistinguishable from that at issue in *Williams* and that both the plurality in *Williams* and Justice Thomas would find it admissible. Accordingly, I concur in the judgment in this case and look forward to the next episode in the Supreme Court's application of the Confrontation Clause to forensic lab reports.

ELDRIDGE, J., dissenting.

I very much doubt whether the majority opinion has correctly interpreted and applied the Confrontation Clause of the Sixth Amendment. Nevertheless, because there was no opinion by the Court in *Williams v. Illinois*, 567 U.S. ——, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), and probably no holding shared by the *Williams* plurality and Justice Thomas, I would no longer attempt to reach the Sixth Amendment issue in this case. Instead, I would hold, as this Court previously held,

---

**2.** *See* R.D. Friedman, *Confrontation and Forensic Laboratory Reports, Round Four,* 45 Texas Tech L.Rev. 51, 81 & n. 200 (2012). *See also United States v. James,* 712 F.3d 79, 95 (2d Cir.2013).

**3.** *See* The Supreme Court 2011 Term, 126 Harv. L.Rev. 266, 276 (2012) (suggesting that the only "true holding" of *Williams* is the rejection by Justice Thomas and the dissenters of the plurality's not-for-truth rationale).

that Derr's right of confrontation under Article 21 of the Maryland Declaration of Rights was violated and that, therefore, Derr is entitled to a new trial as a matter of Maryland law.

## I.

With regard to the Sixth Amendment's Confrontation Clause and the lack of a Supreme Court majority opinion in *Williams v. Illinois,* this Court's majority opinion purports to apply the standard set forth in *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260, 266 (1977), which is as follows (internal quotation marks and citation omitted, emphasis added):

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court *may* be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds...."

Judge Greene's majority opinion for this Court "conclude[s] that the narrowest holding of *Williams* is that a statement, at a minimum, must be formalized to be testimonial" (majority opinion at 115, 73 A.3d at 270) and "that courts should rely on Justice Thomas's concurrence to determine whether a statement is formalized" (*id.* at 116, 73 A.3d at 271).

The Supreme Court has pointed out that the *Marks* "test is more easily stated than applied," *Nichols v. United States,* 511 U.S. 738, 745, 114 S.Ct. 1921, 1926, 128 L.Ed.2d 745, 753 (1994), and *Grutter v. Bollinger,* 539 U.S. 306, 325, 123 S.Ct. 2325, 2337, 156 L.Ed.2d 304, 330 (2003). In *Grutter,* the Supreme Court seemed particularly concerned about applying the *Marks* test to conclude that a portion of the opinion of one Justice, not joined by any other Justice, represented the Court's holding.

If Justice Thomas's opinion in *Williams* did represent the holding of the Court, it is difficult to understand why no member of the plurality joined the Thomas opinion, or why

Justice Thomas did not join a portion of the plurality opinion.[1] Furthermore, the opening paragraph of Justice Thomas's opinion indicated a lack of any common ground between Justice Thomas's opinion and the plurality opinion. Justice Thomas stated: "I share the dissent's view of the plurality's flawed analysis." *Williams,* 567 U.S. at —, 132 S.Ct. at 2255, 183 L.Ed.2d at 129. The opening paragraph of Justice Thomas's *Williams* opinion also referred to his previous concurring opinion in *Michigan v. Bryant,* 562 U.S. —, 131 S.Ct. 1143, 1167, 179 L.Ed.2d 93, 120 (2011), also an opinion which no other Justice joined.

The majority today, based solely on one Justice's lone opinion, overturns this Court's *unanimous* 2011 decision in the present case which had granted Mr. Derr a new trial.[2] Consequently, unless and until the Supreme Court clarifies the application of the Sixth Amendment's Confrontation Clause to evidence of the type involved in this case, Justice Thomas's opinion in *Williams* will control the application in Maryland courts of the Federal Constitution's right of confrontation. Moreover, under the majority opinion today, Justice Thomas's *Williams* opinion apparently will control the application of the Confrontation Clauses in Article 21 of the Maryland Declaration of Rights. I cannot agree with such a result.

## II.

The Confrontation Clauses of the Maryland Constitution, Article 21 of the Declaration of Rights, provide as follows:

---

**1.** Compare Justice Breyer's concurring opinion in *Williams* in which, after disagreeing with both the plurality opinion and the dissent, he stated that he joins the plurality opinion (567 U.S. at —, 132 S.Ct. at 2252, 183 L.Ed.2d at 125).

**2.** In the prior decision, *Derr v. State,* 422 Md. 211, 29 A.3d 533 (2011), the majority opinion, joined by five of the seven judges who sat, granted Derr a new trial based on the erroneous admission into evidence of the results of three tests. A concurring opinion (although captioned "concur and dissent"), joined by two judges, would have granted Derr a new trial based on the erroneous admission into evidence of only the 2002 DNA report. *Derr v. State, supra,* 422 Md. at 269, 29 A.3d at 559.

"That in all criminal prosecutions, every [person] hath a right \* \* \* to be confronted with the witness against him; \* \* \* to examine the witnesses for and against him on oath; \* \* \*."

The above-quoted language is identical to that in Article 19 of the Maryland Declaration of Rights in 1776. Thus, the Confrontation Clauses of the Maryland Constitution preceded by 15 years the Sixth Amendment's Confrontation Clause which was ratified in 1791, and it preceded by 189 years the Supreme Court's decision that the Sixth Amendment's Confrontation Clause was applicable to state criminal proceedings.

In many cases presenting claims that constitutional rights were violated, involving both a provision of the Maryland Constitution and a counterpart provision of the Federal Constitution, this Court's opinions have separately addressed the Maryland constitutional provision. In those cases, upon deciding that a violation of the Maryland Constitution did occur, we have either not reached the Federal constitutional issue or have made it clear that our decision under the Maryland Constitution was independent of our views under the counterpart provision of the Federal Constitution.

Moreover, as the highest Court under the Maryland Constitution, and the Court authorized to render binding decisions interpreting and applying that Constitution, we have not deemed it necessary or appropriate to explain why our decision was based on the Maryland constitutional provision. *See Marshall v. State,* 415 Md. 248, 260, 999 A.2d 1029, 1035 (2010) (While the petitioner relied on both the Federal and the State Constitutions, "we shall rest our decision, as we have often done in the past, solely upon the Maryland provisions"); *Kawamura v. State,* 299 Md. 276, 286, 473 A.2d 438, 444 (1984) ("Because we determine that [the statute] was invalidly applied in light of the state constitution, we need not consider whether there was also a violation of Kawamura's right . . . under the Sixth and Fourteenth Amendments to the federal constitution"). *See also, e.g., Doe v. Dept. of Public Safety,* 430 Md. 535, 547, 62 A.3d 123, 129–130 (2013) (plurality opinion); *Green Party v. Board of Elections,* 377 Md. 127,

153–158, 832 A.2d 214, 229–233 (2003); *Dua v. Comcast Cable,* 370 Md. 604, 620–623, 805 A.2d 1061, 1070–1073 (2002); *Frankel v. Board of Regents,* 361 Md. 298, 312–314, 761 A.2d 324, 332 (2000); *Perry v. State,* 357 Md. 37, 85–87, 741 A.2d 1162, 1188 (1999); *Verzi v. Baltimore County,* 333 Md. 411, 416–418, 427, 635 A.2d 967, 969–970, 974–975 (1994); *Attorney General v. Waldron,* 289 Md. 683, 714–729, 426 A.2d 929, 946–954 (1981).

As pointed out above, we need no particular reason or explanation for resting our decision on the Confrontation Clauses of the Maryland Declaration of Rights and not reaching the issue under the Sixth Amendment's Confrontation Clause. In fact, as Maryland's highest Court, we should be expected to first address a provision of the Maryland Constitution rather than a counterpart provision of the Federal Constitution. Nevertheless, if some reason or explanation were needed or appropriate, the failure of the Supreme Court to render an opinion in *Williams v. Illinois* would clearly justify basing our decision on Article 21 of the Declaration of Rights and not reaching the Sixth Amendment issue.

Another reason for separately discussing and deciding the confrontation issue under Article 21 of the Maryland Declaration of Rights is the history of this case. When the case was before us previously, the first question presented by the appellant Derr was as follows (*Derr v. State,* 422 Md. 211, 215, 29 A.3d 533, 536 (2011), emphasis added, footnote omitted):

"1. Whether Derr's federal *and state constitutional rights of confrontation* were violated when the State was permitted to introduce the opinion of a serology examiner and the results of DNA testing of biological evidence through the testimony of an expert who did not participate either directly or in a supervisory capacity, without calling the analyst who performed the testing as a witness or showing that the analyst was unavailable and Derr had a prior opportunity to cross-examine?"

Our reply to the question was as follows (*Derr,* 422 Md. at 216, 29 A.3d at 536): "We shall answer the first question in the

affirmative." Therefore, this Court in *Derr*, in addition to holding that Derr's Sixth Amendment confrontation right was violated, also held that Derr's "state constitutional right[ ] of confrontation [was] violated."

The next judicial ruling in the case was the Supreme Court's order of June 29, 2012, which stated in its entirety as follows:

> "The petition for a writ of certiorari is granted. The judgment is vacated, and the case is remanded to the Court of Appeals of Maryland for further consideration in light of *Williams v. Illinois*, 567 U.S. —— [132 S.Ct. 2221, 183 L.Ed.2d 89] (2012)."

The only constitutional provision discussed by the various opinions in *Williams v. Illinois* was the Confrontation Clause of the Sixth Amendment to the United States' Constitution. Nothing in the Supreme Court's above-quoted order or in the various *Williams* opinions required this Court to overturn our prior holding that Derr's right of confrontation under Article 21 of the Maryland Declaration of Rights was violated.

After the Supreme Court remand order, the appellant filed a motion for supplemental briefing. This Court on August 20, 2012, filed the following order (emphasis added):

> "ORDERED, by the Court of Appeals of Maryland, that the motion be, and it is hereby granted and supplemental briefing and oral argument *shall be completed separately* on the following constitutional issues:
>
> (1) The application of the Confrontation Clause of the Sixth Amendment in light of the United States Supreme Court's decision in *Williams v. Illinois* [—— U.S. ——], 132 S.Ct. 2221 [183 L.Ed.2d 89] (2012) and the Supreme Court's subsequent decision to vacate the judgment of this Court in *Derr v. State*, 422 Md. 211, 29 A.3d 533 (2011).
>
> (2) The application of the Confrontation Clause of Article 21 of the Md. Declaration of Rights which provides 'in all criminal prosecutions, every man hath a right ... to be confronted with the witnesses against him;' "

\* \* \*

Consequently, our order required that the issue under Article 21 of the Declaration of Rights be treated "separately." Paragraph (2) of the order amounted to a separate reconsideration of Article 21's application under the facts of this case.

Judge Greene's majority opinion today, instead of discussing separately the application of Article 21's Confrontation Clauses to the facts of this case, simply states that a defendant's confrontation rights under Article 21 are *"in pari materia"* with his rights under the Sixth Amendment's Confrontation Clause, and that Derr has failed "to persuade this Court to deviate from that practice" of treating the rights *in pari materia.* (Opinion at p. 103, 73 A.3d at 263). This might be a satisfactory answer *only* if our treating a Maryland constitutional right *in pari materia* with its Federal counterpart meant that the Maryland right would *always* be interpreted and applied *exactly the same* as its Federal counterpart. Of course, as the author of today's majority opinion well knows, that is not the meaning of a Maryland constitutional right being deemed *in pari materia* with a Federal counterpart.

Thus, just this year in *Doe v. Department of Public Safety, supra,* 430 Md. at 547–551, 62 A.3d at 129–132, involving the Maryland Declaration of Rights' *ex post facto* provision in Article 17 and its counterpart in the Federal Constitution, Judge Greene pointed out that (430 Md. at 548, 62 A.3d at 130–131)

"we have read the protection against *ex post facto* laws in Article 17 of the Declaration of Rights *in pari materia* with, or as generally having the same meaning as the *Ex Post Facto* Clause in Article 1 of the federal Constitution."

After saying that the two provisions were *in pari materia,* Judge Greene stated that the "standards may be different" under the two provisions and that (430 Md. at 549, 62 A.3d at 131)

"[t]hroughout our case law, we have recognized that, in many contexts, the protections provided by the Maryland Declaration of Rights are broader than the protections provided by the parallel federal provision."

Judge Greene's opinion continued (*ibid.*) by quoting *Dua v. Comcast Cable*, 370 Md. 604, 621, 805 A.2d 1061, 1071 (2002) as follows:

" 'Many provisions of the Maryland Constitution ... do have counterparts in the United States Constitution. We have often commented that such state constitutional provisions are *in pari materia* with their federal counterparts or are the equivalent of federal constitutional provisions or *generally* should be interpreted in the same manner as federal provisions. Nevertheless, we have also emphasized that, simply because a Maryland constitutional provision is *in pari materia* with a federal one or has a federal counterpart, does *not* mean that the provision will *always* be interpreted or applied in the same manner as its federal counterpart. Furthermore, cases interpreting and applying a federal constitutional provision are only persuasive authority with respect to the similar Maryland provisions.' "

This Court has regularly, and consistently, adhered to the above described meaning of a Maryland constitutional provision being deemed *in pari materia* with a Federal constitutional provision. Recently, in *Frey v. Comptroller*, 422 Md. 111, 176, 29 A.3d 475, 513 (2011), Judge (now Chief Judge) Barbera for the Court emphasized, concerning Article 24 of the Declaration of Rights and the Fourteenth Amendment's Equal Protection Clause, that "our tendency to construe both provisions *in pari materia* does not signal that Article 24 'will *always* be interpreted or applied in the same manner as its federal counterpart.' " Judge Barbera continued (422 Md. at 177, 29 A.3d at 513): "Accordingly, even though we have already determined that the [tax statute] does not violate the Equal Protection Clause of the federal Constitution, we must address separately whether, under the applicable Maryland authorities, that tax violates the State's equal protection guarantee."

In *Lupfer v. State*, 420 Md. 111, 129–130, 21 A.3d 1080, 1091 (2011), concerning the right against self-incrimination, Judge Harrell for the Court stated (citations and footnote omitted):

"A common misperception notwithstanding—that statutory or constitutional provisions that are *'in pari materia'* with one another must be construed in a like manner—we said that 'simply because a Maryland constitutional provision is *in pari materia* with a federal one ... does *not* mean that the provision will *always* be interpreted or applied in the same manner as its federal counterpart.' ... Not inconsistent then with the phrase, *'in pari materia,'* 'we have ... interpreted Maryland's privilege against self-incrimination ... to be more comprehensive than that contained in the federal Bill of Rights.' "

*See also, e.g., Tyler v. College Park,* 415 Md. 475, 499–500, 3 A.3d 421, 434–435 (2010) ("Article 24 and the Fourteenth Amendment are independent and capable of divergent effect"); *Marshall v. State, supra,* 415 Md. at 259–260 n. 4, 999 A.2d at 1035 n. 4 (The Court pointed out that "[t]here is no inconsistency between this Court's statement that [a] Maryland [constitutional right] is 'generally *in pari materia'* with [its federal counterpart] and our holdings that, to some extent, [the] Maryland [provision] grants greater protections to the individual than" the federal counterpart); *Parker v. State,* 402 Md. 372, 401, 936 A.2d 862, 879 (2007); *Green Party v. Board of Elections, supra,* 377 Md. at 153–158, 832 A.2d at 229–232; *Dua v. Comcast Cable, supra,* 370 Md. at 620–623, 805 A.2d at 1066–1068; *Crosby v. State,* 366 Md. 518, 527 n. 8, 534, 784 A.2d 1102, 1107 n. 8, 1111 (2001); *Frankel v. Board of Regents, supra,* 361 Md. at 313, 761 A.2d at 332; *Manikhi v. Mass Transit,* 360 Md. 333, 361–362, 758 A.2d 95, 110 (2000); *Perry v. State, supra,* 357 Md. at 85–87, 741 A.2d at 1168 (1999); *Maryland Aggregates v. State,* 337 Md. 658, 671–672 n. 8, 655 A.2d 886, 893 n. 8 (1995); *Verzi v. Baltimore County, supra,* 333 Md. at 417, 635 A.2d at 970; *Gahan v. State,* 290 Md. 310, 322, 430 A.2d 49, 55 (1981); *Attorney General v. Waldron, supra,* 289 Md. at 714–715, 426 A.2d at 946.

To reiterate, the majority fails to discuss "separately" Article 21's application to the admission of the test results under the facts of this case, and in accordance with our prior order. Moreover, nothing in the Supreme Court's remand order

affects this Court's prior judgment insofar as it was alternatively grounded on Article 21 of the Maryland Declaration of Rights. Consequently, under these circumstances, principles of *stare decisis* should lead the Court to reinstate our prior judgment based entirely on the Confrontation Clauses of Article 21 of the Maryland Declaration of Rights.

Chief Judge BELL joins this dissenting opinion.